MORRIS SHERMAN vs. THE ALLIANCE INSURANCE COMPANY
OF PHILADELPHIA.

SAME vs. NATIONAL LIBERTY INSURANCE COMPANY OF
AMERICA.

SAME vs. THE INSURANCE COMPANY OF PENNSYLVANIA.

SAME vs. ALBANY INSURANCE COMPANY.

SAME vs. CALEDONIAN AMERICAN INSURANCE COMPANY.

SAME vs. THE SVEA FIRE AND LIFE INSURANCE COMPANY,
LIMITED.

SAME vs. GREAT AMERICAN INSURANCE COMPANY OF
NEW YORK.

SAME vs. NIAGARA FIRE INSURANCE COMPANY.

SAME vs. CITY OF NEW YORK INSURANCE COMPANY.

Bristol.    October 23, 1928. — November 28, 1928.

Present: CROSBY, PIERCE, CARROLL, & WAIT, JJ.

*Arbitrament and Award. Insurance,* Fire: arbitration. *Fraud. Evidence,* Of fraud. *Estoppel.*

If, after a loss under a policy of fire insurance, the insured was unable
to agree with the insurer as to the amount of his loss and, under the
terms of the policy, consented to go forward with a hearing before
three arbitrators, one chosen by him, one by the insurer, and the
third, called an umpire, by the other two, although previous to the
hearing he was aware of the existence of conditions which might
influence the judgment of such umpire or had sufficient notice of the
umpire's partiality to put him upon inquiry but remained silent,
the insured cannot after an award object to it on the ground of partiality of the umpire.

Evidence that before the arbitration began such umpire asked "how
much money there was in this matter for compensation"; that, when
it was stated that it was customary to pay $25 a day, he said that
was not enough and that "he was going to get $1,000 as compensation
for acting as umpire," did not warrant a finding that the umpire was
corrupt or expected to obtain by illegal methods the amount suggested.

At the trial of an action upon the policy of insurance above described,
the plaintiff contended that an award by the arbitrators chosen as

above described was made in bad faith by reason of the methods they adopted. All of the evidence before the arbitrators was not before the court and jury, and, upon an examination of the record, it was *held*, that a finding of unfairness or bad faith on the part of the umpire and of the arbitrator appointed by the insurer was not warranted.

NINE ACTIONS OF CONTRACT upon policies of fire insurance. Writs dated November 10, 1924.

In the Superior Court, the actions were tried together before *Greenhalge*, J.

The arbitration clause in the policies was as follows: "In the event of disagreement as to the amount of loss the same shall, as above provided, be ascertained by two competent and disinterested appraisers, the insured and this company each selecting one, and the two so chosen shall first select a competent and disinterested umpire; the appraisers together shall then estimate and appraise the loss, stating separately sound value and damage, and failing to agree, shall submit their differences to the umpire; and the award in writing of any two shall determine the amount of such loss; the parties thereto shall pay the appraiser respectively selected by them and shall bear equally the expenses of the appraisal and umpire."

Other material facts and exceptions by the plaintiff are stated in the opinion. The defendants rested at the close of the plaintiff's evidence and upon their motions the judge ordered verdicts in accordance with the award of the arbitrators plus interest. The plaintiff alleged exceptions.

*D. R. Radovsky*, (*H. W. Radovsky* with him,) for the plaintiff.

*B. A. Brickley*, for the defendants.

CARROLL, J. These are actions of contract on fire insurance policies, insuring the plaintiff's stock and fixtures in Newport, Rhode Island. The loss was sustained in November, 1923. There was an arbitration and an award for $1,952.65, which the plaintiff's arbitrator refused to sign. By direction of the judge the jury returned verdicts aggregating this amount divided among the companies according to their respective policies. It was stipulated that if there

was error in directing the verdicts there should be a finding equalling $6,000 for the plaintiff, divided among the companies.

The plaintiff's amended declaration alleged that the loss was referred to three arbitrators, one chosen by the plaintiff, one by the defendant, and a third by the two so chosen; that the arbitrator chosen by the defendant and the third arbitrator did not act in good faith in determining the amount of the award, and made an award which was not based upon the facts, but was arrived at from improper motives; that the award was not binding, and the plaintiff is entitled to recover the full amount of the loss.

Assuming for the purposes of this discussion that the declaration was in proper form, and that the evidence of fraud introduced by the plaintiff was admissible, see *Second Society of Universalists in Boston* v. *Royal Ins. Co. Ltd.* 221 Mass. 518, he now contends that the evidence shows that the third arbitrator, or "umpire" as he is called, "was not disinterested and impartial," the policies providing that the two arbitrators selected by the parties shall select a "competent and disinterested umpire."

The plaintiff testified that after the loss one Stoneman was selected by the plaintiff and the defendants named one Hennigan to act as arbitrators; "that it took some time before the umpire," C. LeRoy Grinnell, was appointed; that before he was appointed he met the plaintiff and asked him what he was doing, and said, "Would you like to get a position with the Metropolitan Insurance Company?"; that the plaintiff and Grinnell saw the manager of this company and the plaintiff was told to file an application, which he did; that Grinnell agreed to see the plaintiff the following Monday; that at this interview Grinnell said the application "did not go through yet"; that Grinnell asked the plaintiff about the fire, saying, "Why isn't it settled?" to which the plaintiff replied, "I'm waiting for an arbitration. It seems all the men we suggest to the insurance company they reject him"; that Grinnell then said that he "was appointed for the arbitration," and asked "if . . . [the plaintiff] would have any objection to him"; that the plaintiff then said he

"would be only too glad to have anybody, so long as this comes to an end." The plaintiff also testified that Grinnell said: "If I was you, I wouldn't bother the insurance companies; I would go in bankruptcy . . . I have been in bankruptcy myself and paid no one. I wouldn't pay any one. How much do you have to pay your creditors?"; that the plaintiff answered, "Between ten and twelve thousand dollars. I don't see why I should go into bankruptcy, because I am fully insured"; that Grinnell said, "You wouldn't get anything from the insurance companies, but if you would have no objections to appoint me as arbitration, I will do all I can for you and will also see you get a good position with the insurance company." The plaintiff further testified that up to this time he had no knowledge that Grinnell "was in any way connected with the arbitration . . . he found it out the second time he met him."

Stoneman, the plaintiff's arbitrator, testified in substance, that before the arbitration hearing began Grinnell asked "how much money there was in this matter for compensation"; that when it was stated that it was customary to pay $25 a day, Grinnell said that wasn't enough, that "he was going to get $1,000 as compensation for acting as umpire." There was evidence that the value of the plaintiff's merchandise was $14,000, that "the value of what was left" after the fire was about $2,000. Stoneman further testified that when the arbitrators were discussing the amount of the award, Grinnell's "first offer was $500, but it was subsequently increased to $900 and something, and then to $1,650."

The plaintiff contends that the conversation between him and Grinnell, already referred to, was evidence of bad faith on the part of Grinnell. The plaintiff was a party to this conversation, he heard all that was said, and he knew the facts which he now relies on to show the fraud of Grinnell. He was aware of the conditions which might influence the judgment of the arbitrator and had sufficient notice of them; he did not object to Grinnell's acting as umpire. The plaintiff cannot now object that the arbitrator did not act in good faith, because of anything said by Grinnell to him. As was said in *Doherty* v. *Phoenix Ins. Co.* 224 Mass. 310, 315,

where a party to an award "is aware of the existence of conditions which may influence the judgment of an arbitrator or referee, or previous to the hearing has sufficient notice of the partiality of one or more of the referees to put him upon inquiry but remains silent, he cannot afterwards object to the award or report on the ground of partiality." *Fox* v. *Hazelton,* 10 Pick. 275, 278. *Eaton* v. *Globe & Rutgers Fire Ins. Co.* 227 Mass. 354, 366, 367.

The plaintiff further contends that the statements of Grinnell, to the effect that $25 a day "would not interest him"; that he wanted or "was going to get" $1,000, were evidence of fraud. We are unable to find in these statements any evidence of fraud. Grinnell may have placed an exaggerated value on his services, he may have been indiscreet and imprudent, but the evidence does not show that he was corrupt or expected to obtain the amount suggested by illegal methods.

Another contention of the plaintiff's is that the method adopted by the arbitrators in making the award is evidence of bad faith. We do not agree with this contention.

It appeared that the plaintiff's stock in trade consisted of notions, toys, "dry goods, fancy rugs, etc., and crockery"; that the arbitrators examined the store and its condition; that at the hearing before them the only witnesses were the plaintiff and two insurance adjusters. The plaintiff testified that "he did not think the arbitrators asked for his invoices." Stoneman testified that the plaintiff's books, bills, invoices and all kinds of memoranda, were before the arbitrators and they spent considerable time examining the books. In our opinion there was no evidence indicating unfairness in the conduct of Grinnell or the arbitrator Hennigan in coming to the conclusion which they reached, or that they were actuated by improper motives. The premises were examined, according to Stoneman, and the books and invoices were investigated. The award was not necessarily unfair because of the original suggestion of Grinnell to make the award $500, afterwards increasing it to $900, then to $1,650, and finally agreeing on the amount of $1,952. Stoneman testified that although the plaintiff testified his loss was

$10,000 or $11,000, he (Stoneman) "never had any notion that the plaintiff's loss amounted to any $10,000 or $11,000. He thought it amounted to about $6,500." In estimating a loss of this kind it is easy to understand how opinions might differ and honest arbitrators disagree as to the extent and amount of the loss. *Brown* v. *Bellows*, 4 Pick. 179, 192.

In addition to this it did not appear that all the evidence offered before the arbitrators was introduced at the trial. The invoices, books, bills and other memoranda which according to Stoneman were before the arbitrators and examined by them were not offered at the trial. The two insurance adjusters testified before the arbitrators. They did not testify at the trial; and the jury had no opportunity to examine the premises. They did not know the nature of the testimony of the adjusters at the hearing, nor did they see the books and papers in evidence before the referees. On this question, therefore, as the jury were not in possession of all the evidence presented to the arbitrators, the jury could not decide that the umpire and the arbitrator were guilty of misconduct in making the award. "It furthermore does not appear that all the evidence introduced by both parties before the referees was offered at the trial, and a portion is manifestly insufficient to enable a jury to determine whether the referees committed such gross mistakes of overvaluation as to show misconduct." *Doherty* v. *Phoenix Ins. Co.* 224 Mass. 310, 317.

*Exceptions overruled.*
*Verdicts to stand.*